IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

PAMELA L. DAVIDSHOFER,

    Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

    Defendant.

No. C13-2064

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    **PRINCIPLES OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    **FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    A.    *Davidshofer's Education and Employment Background* . . . . . . . . 4
    B.    *Administrative Hearing Testimony* . . . . . . . . . . . . . . . . . . . . 4
        1.    *Davidshofer's Testimony* . . . . . . . . . . . . . . . . . . . . 4
        2.    *Vocational Expert's Testimony* . . . . . . . . . . . . . . . . . . 5
    C.    *Davidshofer's Medical History* . . . . . . . . . . . . . . . . . . . . . . 6

IV.    **CONCLUSIONS OF LAW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    A.    *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . . . . 12
    B.    *Objections Raised By Claimant* . . . . . . . . . . . . . . . . . . . . . . 14
        1.    *Opinions of Dr. Piburn* . . . . . . . . . . . . . . . . . . . . . 14
        2.    *Failure to Consider Davidshofer's Physical Conditions* . . . . . 18
        3.    *Davidshofer's Credibility* . . . . . . . . . . . . . . . . . . . . 20

V.    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VI.    **ORDER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Pamela L. Davidshofer on September 6, 2013, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title II disability insurance benefits. Davidshofer asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits. In the alternative, Davidshofer requests the Court to remand this matter for further proceedings.

## II. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not

2

only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's

conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## III.  FACTS

### A.  *Davidshofer's Education and Employment Background*

Davidshofer was born in 1960.  She completed the 12th grade.  Her past relevant work was as a commercial industrial cleaner.

### B.  *Administrative Hearing Testimony*

#### 1.    *Davidshofer's Testimony*

Davidshofer testified that she last worked in 2007, when she was fired from her employment.  When asked by her attorney why she could not find another job or go back to work, Davidshofer testified that "I have the fibromyalgia, and I can't stand on my feet for a long time, and if I do, then I start getting dizzy and light-headed, and I just cannot go back to cleaning anymore." (AR 39)  Davidshofer's attorney questioned her about her physical and mental problems:

> Q    Okay.  What physical problems do you have?
> A    Well, I have my — I get headaches a lot, and then my legs give out on me, and my hip gives out on me, and I've got that fibromyalgia.  It's really bad too.  It's been going through my body everywhere.
> Q    Okay, and you have mental health problems as well?
> A    Yes, I have mental health, yeah.
> Q    What mental health?
> A    Depression, and anxiety, and I have and stuff, so.

(Administrative Record at 40-41).  According to Davidshofer, she can only stand for ten minutes before she gets dizzy and lightheaded and needs to sit down.  She can only sit for 20 to 30 minutes before "getting really stiff and sore."  She can only walk for four blocks before she gets "out of breath" and dizzy and lightheaded.  Davidshofer described pain in her knees, back, neck, shoulders, and arms, which she attributes to fibromyalgia.  She also

described daily headaches, for which she takes Tylenol. When asked if she had been treated for the headaches, Davidshofer responded that "they said there's nothing wrong."

Davidshofer also testified that she has problems with anxiety and depression. In the past, she has suffered from panic attacks, but medication seems to help and her last panic attack was "a couple years ago." According to Davidshofer, she also has problems with her memory and concentrating. She also gets "mad very easy."

Davidshofer was living with her mother at the time of hearing and helped around the house, including doing half of the housework. She described her typical day as taking her dogs for a walk and then sitting and watching TV "most of the day." She helps her mother by running errands, but complained that "if I drive a long ways; it bothers me too." Davidshofer testified that she likes "walking my dogs" and working on puzzles.

### 2. Vocational Expert's Testimony

Marian Jacobs testified at the hearing as a vocational expert. The ALJ provided Jacobs with a hypothetical individual with certain limitations:

> Assume a hypothetical individual of claimant's age, education and with the past jobs we described on the exhibit. Please assume that this individual is limited to — well, no exertional limitations. The additional limitations would be limited to simple, routine tasks.

(Administrative Record at 56.) Jacobs testified that such a person could perform the job of commercial industrial cleaner. The ALJ then asked the vocational expert if the hypothetical individual of Davidshofer's age could perform any other work? Jacobs testified that she could do the sedentary, unskilled job of "assembler of buttons and notions," "addresser and sorter of envelopes," laundry folder, and housekeeping cleaner. (AR 57)

Davidshofer's attorney offered a hypothetical where the individual would miss work more than three times a month. Jacobs testified that this limitation would preclude competitive employment. Similarly, Jacobs testified that if the person had "noticeable

difficulty" in performing a designated task for more than 20% of the workday, then competitive employment would be precluded.

### C. Davidshofer's Medical History

On February 23, 2009, Davidshofer was initially seen at the Black Hawk-Grundy Mental Health Center.[1] Davidshofer reported that she had been separated from her husband for four years and was seeing "another guy," but that he "wants nothing to do with her." According to Davidshofer, "this hurts her feelings" and she "cries a lot." (AR 369) Davidshofer also reported that a flood had destroyed her trailer "underneath" and that she was living with her mom. Davidshofer described her "active medical problems" as "frequent headaches, scoliosis, tumor in uterus, pain in back & legs." An initial assessment noted poor memory and a short attention span. It was recommended that Davidshofer participate in long term individual therapy every three weeks, with the goal of decreasing her anxiety and depression.

On March 4, 2009, Davidshofer was seen at the University of Iowa Hospitals & Clinics ("UIHC") for uteral fibroids. During a "review of systems," Davidshofer reported that she "gets short of breath with walking" and "has daily headaches," for which she takes acetaminophen. (AR 328) Six days later, on March 12, 2009, Davidshofer was seen at Peoples Community Health Clinic, complaining of shortness of breath. Davidshofer reported that "she becomes short of breath when she walks for a short distance, usually like three or four blocks to her mom's house and she sometimes reports shortness of breath climbing a flight of stairs." (AR 385) A spirometry done in the clinic was completely normal, and a chest x-ray was ordered. When Davidshofer was contacted the following day concerning the negative chest x-ray, she complained of bloating and "gas."

On March 30, 2009, apparently in conjunction with her treatment at the Black Hawk-Grundy Mental Health Center, Davidshofer took the Millon Clinical Multiaxial

---

[1] At that time, the Plaintiff's name was Pamela L. Johnston.

Inventory-III. According to the "capsule summary," Davidshofer's "response style may indicate a tendency to magnify illness, an inclination to complain, or feelings of extreme vulnerability associated with a current episode of acute turmoil." (AR 361)

On April 3, 2009, Davidshofer was seen by Heidi Bonthuis, PA-C, at Peoples Clinic with complaints of periumbilical pain that had been ongoing for approximately six months. (AR 383) On July 6, 2009, Davidshofer called Bonthuis and reported that she was still having periumbilical pain. She also reported feeling dizzy and short of breath. On July 31, 2009, she called in and reported "having the shakes."

On August 17, 2009, Davidshofer was seen by Dr. Pradeep Ramesh at Peoples Clinic. Davidshofer presented "with a one to two week history of headaches." (AR 410) She was taking Tylenol, resulting in partial relief. She did not report any visual problems, no photophobia, and no phonophobia. She also reported some shaking episodes with the headaches. Following an examination, Dr. Ramesh concluded that "[t]his could be tension headaches, she does not have any neurological deficits at this time. No red flag signs or symptoms." (AR 410)

Meanwhile, Davidshofer began counseling with Patricia Nelson, a social worker at Black Hawk-Grundy Mental Health Center. On May 20, 2009, Nelson received a questionnaire from a law firm regarding disability. Nelson "called them back as they indicated because we felt that she didn't meet the criteria that they had stipulated." (AR 357) Nelson encouraged Davidshofer to work through "Vocational Rehabilitation," but on September 11, 2009, Davidshofer reported that "she does not really want to at this time because when she goes there they talk about working more hours than she thinks she can. She wants to wait until she hears from Disability." (AR 355) On November 13, 2009, Davidshofer reported that she was "doing better," was in a new relationship, and "her mood is positive." However, Davidshofer reported she was having "a lot of headaches" and had been diagnosed with fibromyalgia. (AR 353)

On August 19, 2009, Davidshofer was seen again at the UIHC for a follow-up of her fibroid problem. In addition to gynecological issues, Davidshofer complained of abdominal pain. She also complained of fatigue, "stating that she feels like she should be napping during the day." (AR 330)

On October 13, 2009, Davidshofer was seen by Dr. Hamza Ismail at UIHC. She was concerned about headaches, which she said occurred almost daily. (AR 340) The headaches had been going on for at least one-and-a-half years, or even longer, and were sometimes sharp or throbbing. She was taking Tylenol for her headaches, which helped her. She also reported pain in "several different parts of her body including her back." (AR 341) During a physical examination, Dr. Ismail found she had 14/18 tender points for fibromyalgia. The doctor recommended that she "do yoga-type exercises or even aqua therapy to get the fibromyalgia under control." (AR 342)

On August 16, 2010, Davidshofer was referred by DDS to Dr. Siddharth Kapoor for a comprehensive evaluation. According to Dr. Kapoor's report, his examination did not support a finding of fibromyalgia.

> Pamela Lynne Davidshofer is a pleasant 49 year old right handed lady with a history of fibromyalgia and with current findings that are not supportive of that diagnosis. No clear etiology behind her limitations is seen. Based on my evaluation, I do not recommend any physical limitations and this should be as per her functional capacity evaluation.

(Administrative Record at 424.)

In a "Case Analysis" dated August 24, 2010, Dr. Everett Nitzke, a non-examining doctor, noted that Dr. Kapoor's exam "was essentially normal" and that Dr. Kapoor concluded that Davidshofer "did not actually have fibromyalgia." Dr. Nitzke concluded that Davidshofer's symptoms were "not severe enough at this time to prevent her from engaging in a wide range of work activities." (AR 428)

8

On September 1, 2010, DDS referred Davidshofer to Richard A. Martin, Ph.D. for a psychological evaluation. Dr. Martin found that Davidshofer appeared to be of limited intelligence, but "possess[ed] the cognitive abilities required to work within a rather narrow range of simple unskilled vocational situations." (AR 432) Dr. Martin further opined that "[g]iven her very mild depression symptoms, she may experience occasional problems with workplace performance and motivation." (AR 433)

In a mental residual functional capacity assessment dated September 21, 2010, Myrna Tashner, Ed.D., a non-examining doctor, found that Davidshofer was moderately limited in her ability to understand, remember, and carry out detailed instructions. No other significant limitations were noted. (AR 434-36) A psychiatric review technique completed by Dr. Tashner at the same time reflected that Davidshofer suffered from chronic mild depressive disorder. Dr. Tashner found mild limitations to activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (AR 448)

During the summer of 2010, Davidshofer complained of a lump in her left arm. The lipoma was excised in a procedure at UIHC on August 23, 2010. In a follow-up visit on October 5, 2010, Dr. Ismail referred to a "pleasantly pleasant" woman with a history of anxiety and depression. (AR 474) According to Dr. Ismail's note, "[t]he patient has not been seeing a psychiatrist, yet." It would appear that the last time Davidshofer was at the Black Hawk-Grundy Mental Health Center prior to meeting with Dr. Ismail was on April 1, 2010. At that time, Dr. Piburn assessed a GAF of 60-65.

At her UIHC follow-up visit on October 5, 2010, Dr. Ismail also addressed Davidshofer's fibromyalgia and headaches. Dr. Ismail found she had 13 out of 18 tender points for fibromyalgia, and recommended continuing pain medication. He also recommended medication for her headaches, which he believed were likely tension

9

headaches. Davidshofer noted that she was taking medication for anxiety and depression, and would follow-up with a local psychiatrist.

On November 24, 2010, Davidshofer met with Dr. Piburn. While Dr. Piburn's notes are not entirely understandable to the Court, he reviewed Davidshofer's medication and assessed her current GAF at 50. (AR 514-15) Davidshofer was seen again by Dr. Piburn on March 16, 2011, June 14, 2011, and September 19, 2011. On each occasion, he assessed her GAF at 55.

On December 3, 2010, Laura Griffith, D.O., a non-examining doctor, performed a "case analysis." Dr. Griffith opined that new information obtained did not support more restrictive limitations than that noted by Dr. Nitzke in his "case analysis" dated August 24, 2010. (AR 483) Dr. Griffith concluded that Davidshofer's impairments "do not result in more than minimal functional limitations and would be considered non severe."

On December 8, 2010, John Tedesco, Ph.D., a non-examining doctor, concluded in a "case analysis" that there was no evidence of significant cognitive issues. (AR 484) Dr. Tedesco opined that the earlier assessment by Dr. Tashner on September 21, 2010 "can be affirmed as written."

On March 24, 2011, Davidshofer was seen by Dr. Ramesh at Peoples Clinic, complaining of chronic knee pain. According to Davidshofer, the knee "gives out on her," she hears a "popping sensation," and reports the pain as an 8-9/10 in severity. (AR 546) At that time, Dr. Ramesh found "[e]xamination of the knee is completely normal bilaterally." He also notes that "she may have a diagnosis of fibromyalgia." (AR 546)

On October 25, 2011, Davidshofer was seen again by Dr. Ramesh at Peoples Clinic regarding her complaints of fibromyalgia, knee pain, and back pain. Davidshofer complained of stabbing/aching pain in her back and knee, which she described as daily and constant. Davidshofer rated the pain at 10 on a scale of 10. (AR 560) Davidshofer reported "pain all over" which is "constant 8/10 in severity, aggravated by activity,

relieved sub-optimally by rest." (AR 561) Davidshofer described her low back pain as 8-9/10 in severity, with bilateral knee pain 8/10 in severity.

On December 20, 2011, Davidshofer was seen at Peoples Clinic for a "Well Women Visit." At that time, Davidshofer reported that she "has not worked since 2007 because nothing is available. has thought about cleaning houses again. would like to move closer to waterloo. has 2 boys in their 20s." (AR 551) Davidshofer's general appearance was described as "well nourished, well hydrated, no acute distress." Her mood and affect were described as "no depression, anxiety, or agitation." Under "self management goals," it was noted that Davidshofer "wants to exercise more."

On March 22, 2012, Davidshofer was seen by Dr. Piburn. She indicated her mood was "better" and that she had "a little" anxiety. (AR 566) According to Dr. Piburn, her response to treatment was "fairly good" and he placed her current GAF at 60. (AR 567) Davidshofer complained of back and leg pain and provided a "history of multiple falls (dancing)." According to Davidshofer, her "knees give out."

On April 19, 2012, Dr. Piburn filled out a mental impairment questionnaire at the request of Davidshofer's attorney. Dr. Piburn concluded that Davidshofer had "marked" difficulty in carrying out detailed instructions, maintaining attention and concentration over extended periods of time, performing activities within a schedule, maintaining regular attendance, being punctual with customary tolerances, sustaining an ordinary routine without special supervision, and completing a normal work week. Regarding "functional limitation," Dr. Piburn concluded that Davidshofer had "slight" restriction of activities of daily living and difficulties in maintaining social functioning, with "frequent" deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. Dr. Piburn opined that Davidshofer's impairments would cause her to be absent from work more than three times a month.

11

## IV. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Davidshofer is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 404.1520(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the

12

> fourth step asks whether the claimant has the residual
> functional capacity to do past relevant work. If so, the
> claimant is not disabled. Fifth, the ALJ determines whether
> the claimant can perform other jobs in the economy. If so, the
> claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 404.1545. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 404.1545.

The ALJ applied the first step of the analysis and determined that Davidshofer had not engaged in substantial gainful activity since January 17, 2010. At the second step, the ALJ concluded from the medical evidence that Davidshofer has the following severe impairments: depressive disorder and generalized anxiety disorder with panic. At the third step, the ALJ found that Davidshofer did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Davidshofer's RFC as follows:

> [T]he claimant has the residual functional capacity to perform
> a full range of work at all exertional levels but with the

following nonexertional limitations: simple, routine tasks; no
more than frequent contact with supervisors, co-workers, and
the public.

(Administrative Record at 16.) Also at the fourth step, the ALJ determined that
Davidshofer is capable of performing her past relevant work as a commercial industrial
cleaner. Alternatively, the ALJ determined that based on her age, education, previous
work experience, and RFC, Davidshofer could work at jobs that exist in significant
numbers in the national economy. Therefore, the ALJ concluded that Davidshofer was not
disabled.

## B.  Objections Raised By Claimant

Davidshofer argues that the ALJ erred in three respects. First, Davidshofer asserts
that the ALJ failed to give good reasons for discounting the opinions of the treating
psychiatrist, Dr. Marvin F. Piburn. Second, Davidshofer argues that the ALJ erred in
failing to find her fibromyalgia and other physical conditions, singly or in combination,
were not severe. Finally, Davidshofer argues that the ALJ failed to properly evaluate her
subjective allegations under the *Polaski* standard.

### 1.  Opinions of Dr. Piburn

Davidshofer first argues that the ALJ failed to give good reasons for discounting the
opinions of the treating psychiatrist, Dr. Piburn.

An ALJ is required to "assess the record as a whole to determine whether treating
physicians' opinions are inconsistent with substantial evidence on the record." *Travis v.
Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The
opinion of a treating physician:

should not ordinarily be disregarded and is entitled to
substantial weight. A treating physician's opinion regarding
an applicant's impairment will be granted controlling weight,
provided the opinion is well-supported by medically acceptable
clinical and laboratory diagnostic techniques and is not
inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

In his ruling, the ALJ noted that Dr. Piburn and Ms. Nelson (Davidshofer's counselor) jointly signed a statement stating that specific limitations which Davidshofer would have regarding working full time "involve problems with focus and concentration as well as problems with follow through. She also would have trouble with understanding

instructions, and judgment would be poor at times."[2] (AR 489) The ALJ concluded that the limitations described by Dr. Piburn and Nelson appeared supported by the treatment notes, but further concluded that "these limitations are accommodated within the above residual functional capacity assessment." (AR 18)  As noted, the RFC limited Davidshofer's ability to "simple, routine tasks."

In considering the opinions stated by Dr. Piburn in the questionnaire provided to Davidshofer's attorney on April 19, 2012, however, the ALJ afforded only some weight to the opinions.

> The undersigned affords some weight to the opinion as supported by the treatment records as far as diagnoses and treatment are concerned. However, medical records show good response to medications and improved mood, anxiety and anger control with no recent changes or adjustments to medications. The claimant has participated in therapy, but there is no record of recent counseling and last visit notes of record are 11-13-09. (Exhibit B19F) In addition, the opinion is not consistent with other medical evidence of record including visits with the primary care physician which report little or no evidence of depression, anxiety, or agitation. Cymbalta was prescribed by the family physician for pain issues, rather than as an anti-depressant. (Exhibits B12F and B20F) Physical consultative examination in August 2010, by Dr. Kapoor, noted normal mental status exam with recent and remote memory intact and normal attention span. (Exhibit B6F) Further mental consultative examination by Dr. Martin, reported good overall attention and concentration within a formal setting and more limited for intellectual purposes; mood was initially nervous, but appropriate. There was no evidence of thought disorder or language deficits. (Exhibit B8F) For these reasons, the opinion of Dr. Piburn is given less weight as it is inconsistent with other medical evidence.

---

[2] In his ruling, the ALJ stated that the statement was signed in November 2010, citing Exhibit B17F, but in fact the statements were made in a letter to Davidshofer's attorney's office, dated March 1, 2011.

(Administrative Record at 18.)

The last note by Davidshofer's counselor, Patricia Nelson, is dated November 13, 2009. Davidshofer cancelled an appointment on December 16, 2009. (AR 353) As noted by Davidshofer in her brief, however, she saw Dr. Piburn after that date. On April 1, 2010, Dr. Piburn saw Davidshofer for 26 minutes. At that time, he assessed her GAF at 60-65. (AR 351) He saw her again approximately eight months later, on November 24, 2010. In his notes, Dr. Piburn refers to a "theme" of self-defeating behavior, and notes that she has filed for disability benefits based on a combination of physical and mental health problems. For the first time, he assessed her GAF at 50. (AR 514-15) Dr. Piburn saw Davidshofer again on March 16, June 14, and September 19, 2011. On March 16, Dr. Piburn described Davidshofer's mood as "better" and her anxiety as "moderate." (AR 512) On June 14, he described both her mood and anxiety as "better but not remission." (AR 510) On September 19, her mood was described as "ok," with occasional anxiety. Dr. Piburn noted that Davidshofer had "relational/self-defeating 'themes' beyond what Rx med can do." (AR 511) On each occasion, Davidshofer's GAF was assessed at 55. On March 22, 2012, less than one month prior to filling out the questionnaire for Davidshofer's attorney, Dr. Piburn met with Davidshofer. He described her mood as "better," and regarding anxiety wrote "a little lightheaded." At that time, Dr. Piburn described Davidshofer's response to treatment as "fairly good" and assessed her GAF at 60. Dr. Piburn's notes reflect that Davidshofer expressed an interest in going back to school at Hawkeye for use of computers.

Having reviewed the entire record, the Court finds the ALJ properly considered and addressed the opinion evidence provided by Dr. Piburn in the questionnaire. Also, the Court finds the ALJ provided "good reasons" for rejecting Dr. Piburn's opinions. *See Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions

of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 301.

## 2. *Failure to Consider Davidshofer's Physical Conditions*

Next, Davidshofer argues that the ALJ erred in failing to find her fibromyalgia and other physical conditions, singly or in combination, were not severe. That is, Davidshofer argues that her physical conditions should have been included in determining her residual functional capacity.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

In his ruling, the ALJ describes his reasons for concluding Davidshofer's physical conditions were "non-severe."

> As to the claimant's allegations of pain related to fibromyalgia, headaches, back, and arthritis these are found to be non-severe based on the objective medical evidence of record. Evaluation of complaints related to knee pain, falls, and knees "giving out" resulted in negative findings on x-ray and normal range

of motion and strength testing. Headaches were felt to be tension headaches and responded well to Tylenol by the claimant's own admission. She did not require emergency room treatment now [sic] has she been evaluated by a neurologist for headaches. Back pain was attributed to history of scoliosis, but again there was no diagnostic imaging to support this allegation. The claimant underwent excision of lipoma on the left upper extremity without complication or residuals. In December 2011, the claimant had a normal annual exam and received refills of medications. Neurological exam was normal and bilateral lower extremities normal. There was no complaints of falling, dizziness, or balance instability as alleged by the claimant. Fiber was recommended for minor complaints of constipation, along with additional water intake and increased daily exercise. (Exhibits B12F and 20F)

The claimant was evaluated at the University of Iowa in October 2009 for complaints of overall body pain. Range of motion was intact in the upper and lower extremities. Fourteen of eighteen tender points for fibromyalgia were noted. Gait was steady and sensation intact. Conservative treatment such as yoga-type exercise or aqua therapy was recommended for fibromyalgia. No physical limitations were given. (Exhibit 2F) Cymbalta was prescribed by the primary care source in May 2010 for fibromyalgia like symptoms and generalized myofascial pain. Consultative examination in August 2010 by Siddharth Kapoor, M.D. found only four positive tender points, which were not supportive of diagnosis of fibromyalgia. No physical limitations were recommended based on normal physical examination including strength testing, range of motion, and sensory exam. (Exhibit B6F)

(Administrative Record at 14.)

On October 13, 2009, Davidshofer was seen by Dr. Ismail at UIHC. Dr. Ismail addressed a variety of complaints and, without further comment, stated that Davidshofer had 14/18 tender points for fibromyalgia. (AR 341) Dr. Ismail did not place any limitations on Davidshofer, however, but instead suggested that she do "yoga-type

exercises or even aqua therapy." Approximately one year later, on August 16, 2010, Davidshofer was examined by Dr. Kapoor, who concluded that her current condition was not supportive of a diagnosis of fibromyalgia, and he did not recommend any physical limitations. (AR 424) When Davidshofer returned to Dr. Ismail on October 5, 2010, he found, without further discussion, that she had 13 out of 18 tender points for fibromyalgia. Again, Dr. Ismail did not place any limitations on Davidshofer's activities, but advised her to quit yoga exercises. (AR 475)

"An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (citations omitted). In other words, if the impairment would only have a minimal effect on a claimant's ability to work, then it would not constitute a severe impairment. *Id.* (citation omitted). The Eighth Circuit Court of Appeals has stated "[s]everity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard, and we have upheld on numerous occasions the Commissioner's finding that claimant failed to make this showing." *Id.* at 708 (citations omitted).

Having reviewed the entire record, the Court finds that there is substantial evidence to conclude that Plaintiff's physical conditions were non-severe and, therefore, properly excluded from Davidshofer's RFC. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 301.

### 3. Davidshofer's Credibility

Finally, Davidshofer argues that the ALJ failed to properly evaluate her subjective allegations.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's

prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*, 547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v.*

*Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

In his ruling, the ALJ reviews Davidshofer's medical history and subjective complaints. Based on her reported activities and the medical records, however, the ALJ concluded that her statements were not fully credible.

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible to the extent they are inconsistent with the above residual functional capacity assessment. At one point or another in the record, either in forms completed in connection with the application, in medical records or other statements, the claimant reported activities of daily living including independent self-care, household chores such as cleaning and laundry, preparing meals, shopping, running errands, caring for pets, walking her dogs, going out dancing on the weekends, attending church, forming new relationships, visiting with friends on the phone, yard work, watching television, and doing puzzle books. These activities are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Although the claimant has sought and received treatment for the allegedly disabling impairments, that treatment has been essentially routine and/or conservative in nature. She has not required psychiatric hospitalization or emergent care. The claimant has reported good control of symptoms with medications as also reflected

> in the treatment record which notes decreased symptoms and
> no change or adjustments in medications for extended periods.
> Office visits are fairly infrequent every three to six months for
> medication renewals and not for exacerbation of symptoms.

(Administrative Record at 19.)

The Court believes the ALJ's decision adequately considered and discussed Davidshofer's medical history, treatment history, functional restrictions, effectiveness of medications, and activities of daily living in making her credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Davidshofer's subjective allegations of disability were not fully credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Davidshofer's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## V. CONCLUSION

The Court finds that the ALJ properly determined Davidshofer's credibility with regard to her subjective complaints of disability. The Court also finds that the ALJ properly considered the medical evidence and opinions in the record, including the opinion of Dr. Piburn. Finally, the Court concludes that there is substantial evidence in the record

to support the ALJ's finding that Davidshofer's physical conditions were "non-severe." Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## *VI. ORDER*

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;

2. Plaintiff's Complaint (docket number 3) is **DISMISSED with prejudice**; and

3. The Clerk of Court is directed to enter judgment accordingly.

DATED this 22ⁿᵈ day of September, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA